## Gilmor's Estate.   McClelland's Appeal.

*Decedents' estates—Trust—Promissory note—Interest.*

After the death of a decedent there was found among his effects a promissory note for $50,000, signed by decedent to the order of his sister, due one day after date. On the same piece of paper was this memorandum: " N. B. This note is invested in government bonds at 4 per cent belonging to Eliza Gilmor." Decedent had a large sum of money of his sister in his hands, and acted for her under a general power of attorney. The bonds referred to in the memorandum paid interest at the rate of four per cent. On the note were two receipts by the sister for interest at the rate of four per cent. *Held*, (1) that the evidence was insufficient to show ownership of the bonds in the sister or that they were held in trust; and (2) that the parties by their acts showed that the sister was to receive the same rate of interest on her note which her brother received on his investment, and that the sister's administrator was entitled to recover only four per cent interest on the note from the brother's estate.

There was also found amongst decedent's effects a wallet labeled " Eliza Gilmor." In the wallet were mortgages and transcripts of judgments in decedent's name, and also the promissory note referred to above, and two other promissory notes from decedent to his sister Eliza Gilmor. On the inside of the book, on the paper lining, was written in ink, in testator's handwriting, " Eliza Gilmor," and on the same lining, and in the same handwriting, was written twice, in lead pencil, " Eliza Gilmor's money." There was no evidence that decedent had in his possession moneys of his sister in excess of the sums stated in the notes. *Held*, that the administrator of the sister was not entitled to the mortgages and judgments found in the wallet.

Argued March 8, 1893.   Appeal, No. 84, Jan. T., 1893, by Thomas A. McClelland, executor of Eliza Gilmor, deceased, from decree of O. C. Franklin Co., dismissing exceptions to auditor's report distributing estate of John Gilmor, deceased. Before STERRETT, C. J., GREEN, WILLIAMS, McCOLLUM and THOMPSON, JJ.

Adjudication of executor's account.   Before STEWART, P. J.

The account was referred to Alexander Stewart, Esq., as auditor, from whose report it appeared that testator died Nov. 30, 1889, leaving a will by which he directed as follows:

" 1st Item. I give and Bequeath to my beloved Sister Eliza all my Estate real personal and mixed she to receive the interest & profits of the same Dureing her natureal Life should the said Eliza survive me.

" 2nd Item. The bequest to my Sister Eliza is to be managed by my Executors hereinafter mentioned. The United States Government Bonds are not to be Converted into money but to be held By my Executors for the purpose above mentioned. I heirby autherize and empower my Executors to sell my real Estate either at Publick or Private whichever way the same can be sold to the best advantage. But said real Estate is not to be sold unless it can be sold for an advantageous Price."

Eliza Gilmor, testator's sister, and the life beneficiary under his will, died Feb. 24, 1891, leaving a will under which Thomas A. McClelland was executor and a legatee.

The auditor reported as follows:

" At John Gilmor's death his executor, Thomas A. McClelland, discovered, in the former's desk, to which the testator alone had access, a box containing money and three pocketbooks or wallets. One (exhibit H) was labeled, in testator's handwriting, ' John Gilmor.' It contained transcripts of all his judgments except two. It contained nothing else. The second pocketbook (exhibit J) was similarly marked or labeled, in testator's handwriting, ' Eliza Gilmor.' On the inside of the book, on the paper lining, was written in ink, in testator's writing, ' Eliza Gilmor,' and on the same lining and in the same handwriting, was written twice, in lead pencil, ' Eliza Gilmor's money.' This book contained transcripts of the testator's two remaining judgments and all the mortgages he held except one. The missing mortgage was, in part, owned by another man, and was in the custody of Mr. Gehr. This book (' J ') also contained exhibits ' D,' ' E,' ' F ' and ' G,' described in the following paragraph. The third book (exhibit ' L ') was similarly labeled, ' John Gilmor,' and contained some money.

" The exhibits above referred to as ' D,' ' E,' ' F ' and ' G,' found in the pocketbook ' J,' are described as follows: Exhibit ' D,' a single bill or duebill, in the writing of John Gilmor, and signed and sealed by him, in favor of Eliza Gilmor, dated July 1, 1889, for $3,450. Written below that, in the handwriting of John Gilmor, was another duebill in favor of Eliza Gilmor, signed by the testator, for $500, dated October 1, 1889. Exhibit ' E ' was a promissory note, signed by John Gilmor, to the order of Eliza Gilmor, for $50,000, dated April 1, 1889, due one day after date. The entire note was in the tes-

tator's handwriting.  On the same piece of paper, to the left of and below the note, was this memorandum: 'N. B.  This note is invested in Government Bonds at 4 per cent Belonging to Eliza Gilmor.'  Below the note, and to the right of this memorandum, were written, in the testator's writing, two receipts, dated respectively, 'July 1, '89,' and 'October 1st,' for 'five hundred dollars interest on note.'  Each of these receipts was signed 'E. Gilmor.'

"Exhibit 'F' was a note similar to 'E' in payee, amount, date and time, and was in testator's writing.  The signature had been cut and torn away and was not produced.  As in 'E,' to left of and below the note was a memorandum, in testator's writing, in these words: 'N. B.  This note is for Money invested in Government Bonds at four per cent of Belonging to Eliza Gilmor.'  This memorandum and the figures '$50,000' had been canceled by pencil marks.  Indorsed on the back was this receipt: 'July 1, '89, Received on the within note $500 interest.' (Signed) E. G.  This was canceled by pencil marks.

"Exhibit 'G' was a promissory note exactly similar to 'F,' with the memorandum in these words: 'N. B.  This Note is for Money Invested in Government Bonds at Four Per Cent Belonging to Eliza Gilmor.'  The signature to the note had been cut and torn from it.  Below the place where it had apparently been was this receipt: 'July 1, '89 Reced. $500 Dols. interest on Note E. Gilmor.'  The note, memorandum and receipt were in testator's writing, and had been canceled by pencil marks.

"Below the memorandum and receipt, at the foot of the same sheet of paper, was a duebill, in testator's writing, in favor of Eliza Gilmor, for $1,450, dated July 1, 1889, from which the signature had been clipped.  The amount in figures ($1,450) had been canceled by pencil marks.  Between the duebill and the memorandum and receipt was the word 'Cansled,' in lead pencil.

"In the same drawer with the pocketbooks was found exhibit 'M,' a long strip of paper wound around a pack of testator's letters.  Across one side of it was written in testator's hand, 'Mortgage Belongs to Eliza Gilmor $4,000.'  Through this were numerous pencil marks.

"In order to show that Eliza Gilmor had an estate or was

entitled to one equal in amount, at least, to the combined amount of the note 'E,' duebills 'D' and the contents of pocketbook 'J,' and that it was in testator's custody at his death, evidence was submitted on behalf of Eliza Gilmor's executor, from which the following facts are found:

"John Gilmor (the elder) left eight children. In 1863 seven were living—Samuel, William, James, Mary, Joseph, John and Eliza. The other had died unmarried and without issue. Between 1863 and the date of John Gilmor's death, Samuel, Mary, James, William and Joseph Gilmor died, all dying intestate, unmarried and without issue. Each one left to survive him or her as his or her next of kin and heirs at law those of the brothers and sisters then surviving, upon whom the law cast the respective decedents' estates in equal proportions.

"As each one died, administration of the estate was committed to one or more of the survivors, and an appraisement was made of the estate for the collateral inheritance tax. From the records of these appraisements, and of the settlement of the tax, it appears that each one had, at his or her death, a considerable estate, being, respectively, as follows: (1) Samuel, 1863, personal $5,373.95, real $6,496, total $12,869.95, less debts $8,989.84, net balance, $4,780.11. The debts here deducted appear to have been due to his sisters then living. (2) Mary Gilmor, personal $6,116.02, real $1,200, total $7,316.02, less expense $500, net succession $6,816.02. (3) James Gilmor, net succession $27,203.49. (4) William Gilmor, net succession $21,105.47. (5) Joseph Gilmor, net succession $30,592.82.

"Included in these appraisements was the undivided share or interest of each in several tracts of land held by the brothers and sisters in common. Previous to John Gilmor's death all this land was sold, at various times, except the farm and moun-tain or wood land above mentioned. The land so sold brought, in all, about $30,927.50. One sale, that to John White, by John and Eliza, made in March, 1888, yielded $21,000, which money was all invested by Mr. Gehr in John Gilmor's name.

"On July 1, 1879, by letter of attorney of that date, Eliza Gilmor constituted John Gilmor her attorney in fact, with full power to receive and collect any money, debts, etc., due her, and generally to take charge of and manage all her personal property and estate, and to invest the same in any securities

that to him might seem safe and satisfactory, and to manage
her real estate and take the profits thereof.   John Gilmor acted
under this authority to some extent until his death.   It was not
proven to what extent he acted under it.

"The foregoing facts represent as fully the evidence taken
on this subject as the auditor deemed practicable or necessary.
He has endeavored to make them embody every material fact.
He does not find anything in them or in the evidence to war-
rant his finding that the testator was indebted to Eliza Gilmor,
as trustee or otherwise, in any sum greater than that represented
by the duebills 'D' and the note 'E.'   He therefore finds that
the testator, at his death, was indebted to Eliza Gilmor in the
amounts of the duebills 'D,' with interest from their dates, at
six per cent, and in the amount of the note 'E,' with interest
from October 1, 1889, at four per cent, and in no further sum."

The auditor further reported in a supplemental report:

"The claims of Eliza Gilmor's executor were : (a) for the
United States bonds or their value in money, and (b) for cer-
tain mortgages and a judgment found in the pocketbook mark-
ed with her name, or the proceeds thereof.   The facts relating
to these claims are fully set out in the report.   (a) The first
claim was rejected.   So far as it was for the bonds in specie it
was in the teeth of the well known rule that in a distribution
of the orphans' court no claim to the decedent's property can
be adjudicated when made adversely to the decedent's title
thereto.   In this forum only creditors, legatees and next of kin
can be heard: McBride's Ap., 72 Pa. 480 ; Gravenstine's Ap.,
2 Penny. 61 ; High's Est., 136 Pa. 222.

"It was sought to bring the claim within the exception to
this rule established by Marshall v. Hoff, 1 Watts, 440, and
Miller's Ap., 84 Pa. 391, namely, that the fund sought to be re-
covered 'may be shown to be wrongfully in the account, either
because, though in the name of the decedent, it is really a trust,
or because the title is in another person,' and in this aspect the
value of the bonds in money was claimed.

"The right and power of the orphans' court to assume juris-
diction of such a claim cannot be doubted, but the evidence
produced before the auditor wholly failed, in his opinion, to es-
tablish it.   It was shown that for some years the testator had
acted as Eliza Gilmor's attorney in fact, and had, from time to

time, received into his hands a large sum of money belonging to her. On April 1, 1889, a few months before his death, he made, in her favor, a promissory note of $50,000, and below it wrote a memorandum to the effect that it was 'invested in government bonds at four per cent, belonging to Eliza Gilmor.' How this can be construed into a declaration that all of the bonds in testator's name belonged to Eliza Gilmor, or that he held them in trust for her, the auditor cannot see. The note was a declaration that the testator owed Eliza $50,000 on the date thereof, and the memorandum seems to do no more than indicate where it was invested. If it had appeared that the testator had bought, with $50,000 of Eliza's money, bonds of that par value, and had held them as hers, then her right to any increase in their value would be clear. But there was not a word of evidence to show when, with whose money or at what price the bonds had been bought. For all that the evidence shows the testator may have bought them on April 1, 1889, or at any other time, using $50,000 of his sister's money and enough of his own to make up the balance of their cost. The memorandum seems entirely consistent with such a theory, and, when taken in connection with the note, inconsistent with any other.

" An additional reason why, even if the evidence had been thought sufficient, the auditor would be compelled to reject this claim is that the premiums on the bonds do not enter into the account, and it would be impossible to ascertain their amount, and, if ascertained, to award them.

" The claim was accordingly rejected in so far as it exceeded the face of the note, $50,000, with interest. The duebills found with it were also allowed, with interest.

" (b) The second claim was for the mortgages and judgment in the pocketbook, or their proceeds. It was rejected for much the same reason as the former claim—the auditor did not think the evidence sufficient to sustain it in any aspect in which it might be considered. As the auditor gathered from the arguments of the claimants' counsel, there were three grounds upon which the claim might be rested : (1) That the setting aside of these securities in the wallet marked with Eliza Gilmor's name, and containing the note and duebills above mentioned, amounted to a gift of them to her ; (2) that, taken in connection with his relation to her as attorney in fact, it

amounted to an acknowledgment of his indebtedness to her in that amount; and (3) that it amounted to a declaration of trust on his part in her favor.

" The evidence of the testator's indebtedness to Eliza Gilmor, as shown by the report, was that she had inherited from her brothers and sisters, dying intestate, at various times from 1863 to 1879, about $33,000, and that in 1879 she had given the testator a general power of attorney for the management of her estate.   Apparently it had all passed into his hands, for when she died her executor found nothing, practically, upon which to administer.   This seemed sufficient to the auditor to warrant the conclusion that the testator died indebted to his sister, and the note and the duebills above referred to confirm that conclusion.   But the evidence seemed by itself, without any declarations or admissions of the testator, insufficient to fix the amount of the indebtedness.   These were altogether wanting, except in the notes and duebills, and in determining this question and that concerning the United States bonds, the auditor has looked upon the notes and duebills as furnishing the only safe measure of the testator's indebtedness.   It seemed incredible that the testator should have taken such pains accurately to fix and ascertain a portion of this indebtedness, and then leave the balance to be evidenced by his sister's name on the receptacle of certain papers.   The auditor does not wish to be understood by this as admitting the testator to limit his liability by his own declaration.   What he means is that without such declaration it would be impossible to fix the liability at all, and that when the placing of these securities in the marked book is contrasted with the care with which the note and duebills were prepared, it loses all force as an admission of indebtedness.   If this be so, then the second ground upon which the claim is made—as a debt—must fail, because no indebtedness is established.   The first ground also fails, for as a gift it is without consideration and void, because unexecuted.   Plumstead's Ap., 4 S. & R. 545 ; Crawford's Ap., 61 Pa. 52.

" This leaves the claim to be sustained, if at all, upon the footing of a declaration of trust, and the auditor finds the evidence upon this subject quite as unsatisfactory as upon those already discussed.   It consists of the placing of the securities claimed in a pocketbook, along with the notes and duebills,

the book bearing on the outside a label with 'Eliza Gilmor' written thereon in the testator's writing, and the words 'Eliza Gilmor's Money,' written in the same writing, in pencil, on the paper lining of the book. There was nothing whatever to connect these marks on the book with its contents. There was nothing to show at what time or for what purpose they were made. They stand alone and upon them the trust, if trust there be, must rest.

"'There is no certain form required in the creation of a trust. In the case of personal property or choses in action trusts may be proved by parol. If the declaration is in writing . . . . it may be couched in any language which is sufficiently expressive of the intention to create a trust.' CLARK, J., in Smith's Est., 144 Pa. 428.

"'The intention must be plainly manifest and not derived from loose and equivocal expressions made at different times and upon different occasions. The donor need not say in so many words, "I declare myself a trustee," but he must do something which is equivalent to it and use expressions which have that meaning; for, however anxious a court may be to carry out a man's intention, it is not at liberty to construe the words otherwise than according to their proper meaning:' Id. 437.

"The requisites for raising a trust of this nature (and it will be observed that the auditor, having found no indebtedness between the parties, treats this as a purely voluntary one) are stated by Mr. Bispham to be three in number—'sufficient words to create it, a definite subject, and a certain or ascertained object; to which may be added another, that the terms of the trust should be sufficiently declared:' Eq. 65.

"And in the English case of Warriner v. Rodgers, L. R. 16 Eq. 340, BACON, V. C., makes it indispensable to the validity of such a declaration that the donor part absolutely with that interest in the subject-matter which has been his up to the declaration, and put the property out of his power, at least in the way of interest.

"Now applying these principles to the facts of this case it seems to the auditor almost beyond question that the declaration of trust, if any was intended, must fail for want of the most essential and necessary features. The only one of Mr.

Bispham's requisites which is present is the 'certain or ascertained object'—Eliza Gilmor. The subject is altogether uncertain, for the words on the book are in no way connected with its contents; and the words used are certainly, in the absence of such connection, insufficient to create it, for they are expressive of no intention whatever. Mr. Bispham's additional essential is also wanting, for there is no declaration of the terms of the trust.

" Then, too, the fact that this disposition of the securities was never made known by the testator to any one in his lifetime, is important. It would not be essential that he had done so, if the memoranda on the book appeared to be the deliberate expression of his purpose, or if such fact could be established by any circumstances. But the failure of the memoranda, so to speak, and the absence of any such circumstances would seem to make it a significant fact that the trust was kept secret by the testator."

Exceptions by Thomas A. McClelland, executor of Eliza Gilmor, deceased, dismissed; whereupon exceptants appealed.

*Errors assigned* were dismissal of exceptions, quoting them.

*O. C. Bowers, H. Gehr* with him, for appellants, cited : Smith's Est., 144 Pa. 428 ; Gaffney's Est., 146 Pa. 49 ; German v. Gabbald, 3 Bin. 302 ; Wallace v. Duffield, 2 S. & R. 521 ; Slaymaker v. St. John, 5 Watts, 27 ; Jackman v. Ringland, 4 W. & S. 149 ; Lloyd v. Carter, 17 Pa. 216 ; Farrell v. Lloyd, 69 Pa. 239 ; Raybold v. Raybold, 20 Pa. 308.

*W. Rush Gillan, W. U. Brewer* with him, for appellees, cited : Bush, Bunn & Co.'s Ap., 65 Pa. 363 ; McBride's Ap., 72 Pa. 480 ; Braman's Ap., 89 Pa. 78 ; Wylie's Ap., 92 Pa. 196 ; William's Ap., 101 Pa. 474 ; Winton's Ap., 111 Pa. 387 ; Gravenstine's Ap., 2 Penny. 61 ; Miller's Ap., 84 Pa. 391 ; Plumstead's Ap., 4 S. & R. 545 ; Crawford's Ap., 61 Pa. 52.

OPINION BY MR. JUSTICE McCOLLUM, November 6, 1893 :

Three questions are raised by this appeal. They are : (1) Whether the learned court below erred in refusing to award to the appellant the value of the four per cent government

bonds which he claimed belonged to the estate of Eliza Gilmor, deceased; (2) whether it was error to calculate interest at four per cent on the $50,000 secured by John Gilmor's note under date of April 1, 1889; and (3) whether error was committed in the refusal to award to the appellant the amount of the mortgages and judgments found in the wallet labeled in John Gilmor's handwriting "Eliza Gilmor," and designated by the learned auditor in his report as exhibit "J."

From the inventory of the personal property of John Gilmor, filed December 28, 1889, we learn that the face value of the government bonds held by him was $60,000, and that with the accrued interest and premium they were then worth $72,400. It is claimed by the appellant that although these bonds were in John Gilmor's name, Eliza Gilmor's money to the amount of $50,000 was used in the purchase of them, and that her estate is therefore entitled to receive from the estate of John Gilmor the sum which bonds of the face value of $50,000 were worth at the time of the inventory. It will be noticed that this claim assumes that the bonds were bought at their face value, and that there is nothing on this record which shows when they were bought or the price paid for them. In the absence of evidence on this point the fair presumption is that the amount paid was their market value at the time of the purchase. As there was no fraud or bad faith in the transaction, and it does not appear that they were bought for less than they were appraised at in December, 1889, it follows that if the claim is valid in other respects the most that can be recovered upon it is their face value, $50,000, with interest from October, 1889, and as that amount was awarded to the appellant by the learned court below, on the theory that the money invested in the bonds was a loan to John Gilmor for which he gave the note above mentioned, it seems to be unnecessary to further consider this branch of the case. But is there any merit in the claim that Eliza Gilmor was the owner of five sixths of the bonds held by her brother John? The only evidence to support it is the memorandum made by him on his note to her for $50,000. The learned auditor, reading the memorandum in the light of the surrounding circumstances, held, with the approval of the learned court below, that it, considered in connection with the note on which it was indorsed, was not equivalent to a declaration that he bought

and held the bonds for her, but that it was intended simply to show how he had invested the money for which the note was given. This conclusion is consistent with the conduct of the parties, which was clearly inconsistent with the claim made by the appellant. John Gilmor paid interest on the note to Eliza Gilmor, July 1, and October 1, 1889, as appears by her receipts written thereon. While they said in plain words that the money so paid and received was interest on the note, and thus recognized the $50,000 as a debt due from the maker to the payee, we are asked to contradict them and say that it was interest on her bonds. We cannot do this unless we regard the note with the indorsement upon it as a declaration of trust instead of an obligation for the payment of money. The memorandum is clearly insufficient to warrant an inference that John held the government bonds in trust for Eliza, or to discharge him from liability to her on the note according to its terms.

Was it error to refuse to award to the appellant interest on this note at the rate of six per cent? The note was payable one day after its date, and the payee would, in the absence of evidence qualifying her right, be entitled to interest upon it from its maturity at the legal rate. But it is a fair implication from the receipts upon it that the parties agreed upon a rate of four per cent. It is not unnatural or unreasonable in view of their relations that the payee should be willing to accept and the maker to pay the same rate of interest that he received on his investment of the money for which he gave the note. In the adoption of this rate by the learned auditor the appellant secures the same interest he would have received if he had established his claim to the bonds.

The learned auditor was clearly right in refusing to award to the appellant the amount of the mortgages and judgments found in the wallet labeled " Eliza Gilmor." This wallet was in John Gilmor's possession at the time of his death, the mortgages and judgments were in his name, and there was no evidence showing that any of Eliza's money was invested in them. The entry upon and the entry within the wallet were relied on to support the claim that John held these securities in trust for his sister, but they furnished no adequate ground for an inference that he so held them. Aside from these entries there was nothing to suggest that she had any interest in them. The

theory that they belonged to her derives no support from the claim that her estate is much larger than the note and duebill. This claim is not sustained by the evidence. If it be conceded that all of Eliza's property exclusive of her unsold interests in real estate passed into John's hands under the power of attorney dated July 1, 1879, the appellant has no just cause to complain of the decree, because he received under it at least $25,000 more than he has shown such property was worth. The note and duebill were acknowledgments by John that he was indebted to his sister in the amounts stated in them, and we think the conclusion of the learned auditor that they furnished the measure of his liability was warranted by the evidence.

The specifications of error are overruled.

Decree affirmed and appeal dismissed at the costs of the appellant.